COMMONWEALTH of Pennsylvania,
Appellee

v.

Randall Wayne BISHOP, Appellant.

Superior Court of Pennsylvania.

Submitted Sept. 4, 2007.
Filed Nov. 16, 2007.

Rebecca R. Good, Pittsburgh, for appellant.

Michael W. Streily, Deputy Dist. Atty., Pittsburgh, for Com., appellee.

BEFORE: MUSMANNO, LALLY-GREEN, and ANTHONY *, JJ.

OPINION BY ANTHONY, J.:

¶ 1 Randall Wayne Bishop ("Appellant") appeals *nunc pro tunc* from the judgment of sentence that was imposed on February 14, 2002, in the Allegheny County Court of Common Pleas. Upon review, we affirm. The relevant facts and procedural history of this matter are as follows.

¶ 2 At approximately 2:30 a.m. on June 8, 2001, Jennifer Kowaleski and her cousin, Mark Kowaleski, went to Primanti Brothers restaurant in the Strip District of Pittsburgh. Once inside, Jennifer walked downstairs to use the restroom. However, after she finished using the facilities and was leaving the restroom, a man wearing a white cowboy hat pushed her back into the lavatory while holding a knife to her throat. The man in the cowboy hat was later identified as Appellant.

¶ 3 As the assault escalated, Appellant continued to hold the knife near Jennifer's throat and he began kissing her neck and touching her breasts. Appellant removed all of Jennifer's clothing except for her socks. He then pushed Jennifer to the floor of the bathroom and positioned her so that he was behind her. Appellant then began touching Jennifer's vagina with his fingers, and while behind her, he attempt-

* Retired Senior Judge assigned to The Superior Court.

ed to force his penis into her anus; however, Appellant was unable to penetrate her, but he continued rubbing his penis against her buttocks. Appellant then placed a condom on his penis and rolled Jennifer onto her back. He attempted to penetrate her vagina, but he was unable to complete insertion due to his inability to maintain an erection. At this point, Appellant instructed Jennifer to perform fellatio on him and she complied.

¶ 4 Curious as to what was taking his cousin so long in the restroom, Mark knocked on the door of the women's room. As Jennifer screamed for help, Appellant began choking her. Hearing his cousin in distress, Mark broke down the bathroom door. Jennifer was able to escape while Mark detained Appellant.

¶ 5 Appellant was arrested and charged with rape (18 Pa.C.S.A. § 3121(1) and (2)), two counts of involuntary deviate sexual intercourse (18 Pa.C.S.A. § 3123(a)(1) and (2)), two counts of aggravated assault (18 Pa.C.S.A. § 2702(a)(1)), unlawful restraint (18 Pa.C.S.A. § 2902), possessing instruments of crime (18 Pa.C.S.A. § 907), and indecent assault (18 Pa.C.S.A. § 3126(a)(1)). On November 14, 2001, the case proceeded to a jury trial before the Honorable Kathleen Durkin. On November 20, 2001, the jury found Appellant guilty of rape, one count of involuntary deviate sexual intercourse, one count of aggravated assault, unlawful restraint, possessing an instrument of crime, and indecent assault. The Sexual Offender Assessment Board determined that Appellant was a sexually violent predator (SVP), and on February 14, 2002, the trial court sentenced Appellant as follows: seven to twenty years' imprisonment for the rape conviction; seven to twenty years' imprisonment for the involuntary deviate sexual intercourse conviction consecutive to the sentence for rape; six to twenty years'

imprisonment for the aggravated assault conviction consecutive to the sentence for involuntary deviate sexual intercourse; seven months' to two years' imprisonment for the unlawful restraint conviction consecutive to the sentence for aggravated assault; and with respect to possessing an instrument of crime and indecent assault, no further penalty was imposed. This resulted in an aggregate term of twenty years and seven months to sixty-two years in prison. Appellant did not file a post-sentence motion or direct appeal.

¶ 6 On February 12, 2003, Appellant, *pro se*, filed a timely petition for relief pursuant to the Post Conviction Relief Act (PCRA). 42 Pa.C.S.A. §§ 9541–9546. Counsel was appointed, and on January 17, 2006, an amended PCRA petition was filed. A hearing was held on the petition on December 5, 2006, and the trial court reinstated Appellant's direct appeal rights *nunc pro tunc*. This timely direct appeal followed.

¶ 7 On appeal, Appellant raises the following claims of error:

I. Were [Appellant's] state and federal constitutional rights to due process of the law and effective assistance of counsel violated by several instances of trial counsel's acts which individually and collectively prejudiced [Appellant] at trial such that the lower court should have granted [Appellant] a new trial?

    A. Did trial counsel offer ineffective assistance of counsel when he opened the door to evidence about the FBI's investigation of [Appellant] as a possible serial rapist and murderer?

    B. Did trial counsel offer ineffective assistance of counsel when he elicited testimony that [Appellant] asserted his Fifth Amendment right and requested counsel when interrogated/questioned by Detective Rush?

C. Can [Appellant's] ineffectiveness of counsel claims be adjudicated in this direct appeal after a hearing on trial counsel's ineffectiveness occurred and where there [sic] record is fully developed?

II. Has the Commonwealth met its burden to prove by clear and convincing evidence that a person is a sexually violent predator when most of the Megan's Law statute's criteria have not been met and when the person is not a repeat sex offender or child molester?

III. Did the lower court err when it permitted Detective Rush's hearsay testimony about a conversation with [Appellant's wife] in which she stated: (1) [Appellant] resembled a suspect she saw on the television show *America's Most Wanted;* and, (2) in the trunk of [Appellant's] car she found a paper bag containing a knife, duct tape, a mask, and a condom and when she approached [Appellant] about these items he physically abused her and then destroyed the items?

IV. Did the lower court err when it permitted the Commonwealth to introduce testimony about nine non-obscene legal pornographic magazines seized from [Appellant's] truck?

Brief for Appellant, at 4.

¶ 8 In Appellant's first issue, he claims instances of ineffective assistance of trial counsel. In *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), the Pennsylvania Supreme Court announced that as a general rule, claims of ineffective assistance of counsel should not be raised on direct appeal, and are properly brought in a collateral proceeding. However, an exception to the general rule in *Grant* occurs where a hearing was held on the ineffective claims and a record was developed. *See Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831 (2003), *cert. denied,* 540 U.S.

1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004).

¶ 9 As mentioned above, Appellant filed a PCRA petition whereby his direct appeal rights were reinstated. However, in that petition, Appellant also raised claims of counsel's ineffectiveness. The trial court held a hearing, a record was developed, and the trial court made findings with respect to Appellant's claims of ineffectiveness. Accordingly, we find that the instant case falls into the narrow exception to *Grant, supra* that was enumerated in *Bomar, supra.*

¶ 10 The standard of review we employ when reviewing a claim of ineffective assistance of counsel is settled. To prevail on an ineffective assistance of counsel claim, the appellant must overcome the presumption of counsel's competence by showing that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) the appellant suffered prejudice, i.e., but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceeding would have been different. *Commonwealth v. Manuel,* 844 A.2d 1, 7 (Pa.Super.2004). A failure to satisfy any one prong of the test for ineffectiveness will result in this Court's rejection of the claim. *Id.*

¶ 11 Here, Appellant first claims that trial counsel was ineffective when he initiated questions concerning an FBI investigation into Appellant being a suspected serial rapist and murderer. Some background is in order.

¶ 12 When Appellant was arrested, Pittsburgh Police Detective Tim Rush (Detective Rush) contacted Appellant's wife (Mrs. Bishop) regarding his arrest. Mrs. Bishop informed Detective Rush that she

had seen an episode of the television program *America's Most Wanted* and the show had done a profile and presented a photograph of a man that resembled Appellant. Mrs. Bishop also told the detective that she found a bag in Appellant's car that contained a knife, duct tape, a mask, and a used condom. Based on this information, Detective Rush contacted the FBI. Ultimately, the FBI investigated Appellant, an interstate truck driver, due to similarities between this case and other crimes but eventually ceased their inquiry because there was little correlation between the instant case and the serial rapist's case the FBI was investigating.

¶ 13 Appellant claims that the very mention of the FBI investigation tainted his defense. However, trial counsel defended his actions and explained that the rationale for bringing up the *America's Most Wanted* and FBI probe was to illustrate that it went nowhere. At the PCRA hearing, counsel stated that he wanted to illustrate that when Appellant was questioned by the FBI he was cooperative and that the FBI investigation was ill-founded and farfetched. N.T., PCRA Hearing, 12/05/2006, at 23–24. Ultimately, counsel hoped to show that the prosecution rushed to judgment in Appellant's case. *Id.* at 24. Appellant's defense was that the sexual encounter was consensual and that any further investigation was comical. *Id.* at 25.

¶ 14 After the PCRA hearing, the trial court concluded that Appellant failed to illustrate how counsel's queries regarding the FBI investigation undermined that truth determining process so that no reliable adjudication of guilt or innocence could have taken place. Trial Court Opinion, 01/24/2007, at 5. Upon review, we

agree. While we conclude that Appellant's underlying claim has arguable merit, and while we are hard-pressed to find any reasonable basis for counsel's introduction of the FBI investigation, we find that in light of the overwhelming evidence of Appellant's guilt, he suffered no prejudice. Appellant was caught in a state of undress choking the nude victim who had sustained cuts and abrasions on her neck. Appellant was found in possession of a knife and used condom containing his and the victim's DNA after an eyewitness, the victim's cousin, came to her aid when she screamed for help from inside the women's restroom. Regardless of whether counsel mentioned the FBI investigation, there is no reasonable probability that the outcome of the trial would have been different.[1] *See Commonwealth v. Molina,* 897 A.2d 1190 (Pa.Super.2006) (holding that where the evidence of guilt is overwhelming, counsel's purported ineffectiveness fails the prejudice prong) citing *Commonwealth v. Saranchak,* 581 Pa. 490, 866 A.2d 292 (2005).

¶ 15 Next, Appellant argues that counsel was ineffective in eliciting testimony from Detective Rush regarding Appellant's post-arrest silence and request for an attorney. The challenged exchange, which occurred during counsel's cross-examination of the detective, is reproduced below:

[Counsel for Appellant] Q: Now, Detective, as far as you dealing with [Appellant], would it be fair to say that he was extremely cooperative with you?

[Detective Rush] A: Well, when I— when I first came in contact with him, he did not want to speak with us. He

---

1. We note that Appellant has not challenged the sufficiency of the evidence underlying his convictions.

wanted to speak with his lawyer. So in that respect from my angle, no.

N.T. Trial, 11/14/2001, at 254. At the PCRA hearing, counsel explained that he was attempting to illustrate that Appellant was cooperative with the investigation. N.T., PCRA Hearing, 12/05/2006, at 23–24. Accordingly, this question was clearly intended to effectuate Appellant's best interests. The fact that counsel elicited an answer that he was not expecting, does not negate the reasonable basis counsel had in making the inquiry. Moreover, just as in our analysis of Appellant's first issue, we conclude that there was no prejudice as the evidence of Appellant's guilt was overwhelming, and there is no reasonable probability that the outcome of the trial would have been different absent counsel's question to Detective Rush.

■■■ ¶ 16 Next, Appellant claims that the Commonwealth failed to prove that he met the SVP criteria. "Questions of evidentiary sufficiency present questions of law; thus, 'our standard of review is de novo and our scope of review is plenary.'" *Commonwealth v. Meals*, 590 Pa. 110, 912 A.2d 213, 218 (2006) quoting *Commonwealth v. Sanford*, 580 Pa. 604, 863 A.2d 428, 431 (2004). In reviewing such a claim, we consider the evidence in the light most favorable to the Commonwealth, which prevailed upon the issue at trial. *Id.*

¶ 17 Megan's Law II defines an SVP as a person who has been convicted of a sexually violent offense as set forth in § 9795.1 and who is determined to be a sexually violent predator under § 9795.4 due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses. The statute defines mental abnormality as a congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes

that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons. The term predatory, in turn, is defined as an act directed at a stranger or at a person with whom a relationship has been initiated, established, maintained or promoted, in whole or in part, in order to facilitate or support victimization.

*Meals, supra* at 218–219 (internal citations and quotation marks omitted).

■■ ¶ 18 "The standard of proof governing the determination of SVP status, i.e., 'clear and convincing evidence,' has been described as an 'intermediate' test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt." *Id.* at 219. The clear and convincing standard requires evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. *Id.*

¶ 19 The Sexual Offender Assessment Board, in making its assessment, is to follow the procedure set forth in 42 Pa. C.S.A. § 9795.4. The relevant portions are set forth below.

§ 9795.4. Assessments

(b) Assessment.—Upon receipt from the court of an order for an assessment, a member of the board as designated by the administrative officer of the board shall conduct an assessment of the individual to determine if the individual should be classified as a sexually violent predator. The board shall establish standards for evaluations and for evaluators conducting the assessments. An assessment shall include, but not be limited to, an examination of the following:

(1) Facts of the current offense, including:

(i) Whether the offense involved multiple victims.

(ii) Whether the individual exceeded the means necessary to achieve the offense.

(iii) The nature of the sexual contact with the victim.

(iv) Relationship of the individual to the victim.

(v) Age of the victim.

(vi) Whether the offense included a display of unusual cruelty by the individual during the commission of the crime.

(vii) The mental capacity of the victim.

(2) Prior offense history, including:

(i) The individual's prior criminal record.

(ii) Whether the individual completed any prior sentences.

(iii) Whether the individual participated in available programs for sexual offenders.

(3) Characteristics of the individual, including:

(i) Age of the individual.

(ii) Use of illegal drugs by the individual.

(iii) Any mental illness, mental disability or mental abnormality.

(iv) Behavioral characteristics that contribute to the individual's conduct.

(4) Factors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of reoffense.

42 Pa.C.S.A. § 9795.4(b).

¶ 20 Here, the assessment was made by Dr. Paul Bernstein, a member of the Sexual Offender Assessment Board. He determined that Appellant had a narcissistic personality disorder. Dr. Bernstein concluded that Appellant had a grandiose sense of self importance, fantasies about becoming a Christian minister and having power, and exhibited his arrogance and sense of self in a way where he thought that he could rape a woman in a public bathroom without being caught. N.T. Sentencing, 02/14.2002, at 36–40.

¶ 21 Dr. Bernstein, upon direct examination by the Commonwealth, described certain factors he considered in making his determination that Appellant is an SVP:

[Counsel for the Commonwealth] Q: Doctor, is one of the—you indicated one of the factors that you take into account in making your determinations and your findings is the nature of the crime; is that correct?

[Dr. Bernstein] A: Yes.

Q: And in this particular case, you had information that this crime was committed at knifepoint; is that correct?

A: That's correct.

Q: And that crime was committed in a public rest room?

A: Yes.

Q: What did those factors indicate to you about [Appellant]?

A: That the defendant was extremely eccentric in believing that he could perpetrate a crime in a public place and get away with it. That it was extremely audacious. That he was above and beyond being held accountable for his behaviors. That he could get away with this. That it was part of his pattern of behavior.

Q: One of the factors that you were to consider is whether or not [Appellant's] primary purpose in the relationship with a victim in the case is for the primary purpose of victimization; is that correct?

A: That's correct.

Q: What did you find in this case?

A: The definition of "predatory behavior" or "predator" from the Commonwealth is that a person takes advantage of a stranger for the purpose of victimization. The language has the word "relationship" in it. And, in this case, [Appellant] by use of a lethal weapon forced his victim into a situation in which she was raped.

N.T., Sentencing, 02/14/2002, at 14–16. Moreover, Dr. Bernstein considered the statements that Appellant made to the FBI that he had rape fantasies and carried around items in his car to facilitate such a rape as evidence that he was likely to recidivate.

¶ 22 In his brief, Appellant argues that he should not have been deemed an SVP because he did not meet all the criteria. He claims that this was his first sexual offense, he had no prior criminal record, there was only one victim, he does not have a substance abuse problem, and the victim was an adult, not a child. Brief for Appellant at 40–41. Upon review, we conclude that Appellant receives no "points" for these factors in his case. In fact, Appellant misses the point.

¶ 23 The considerations set forth in 42 Pa.C.S.A. § 9795.4(b) are not a simple checklist. *Meals, supra* at 222. The considerations are separate and weighed accordingly. *See id.* Based on all the evidence presented in this case and the findings by the Sexual Offenders Assessment Board, we find no error in the trial court's conclusion that there was clear and convincing evidence to sustain Appellant's designation as an SVP. Appellant is entitled to no relief on this claim.

¶ 24 In his next claim of error, Appellant asserts that the trial court erred when it permitted Detective Rush to testify about what Appellant's wife told him during a phone conversation. Specifically, Appellant complains that Detective Rush testified that Mrs. Bishop told him that: Appellant resembled a rape suspect she saw on *America's Most Wanted;* she found a bag in Appellant's trunk containing a knife, duct tape, a condom, and a mask; and, when Mrs. Bishop confronted Appellant about what she found in the trunk, he physically abused her and destroyed the items. Brief for Appellant, at 54. Appellant claims that this statement by Mrs. Bishop was hearsay and inadmissible. Appellant notes that trial counsel objected on the basis of hearsay but that the trial court allowed Detective Rush to answer based on "the police course of conduct exception to Pennsylvania's hearsay rule." Brief for Appellant, at 54. Upon review, while we agree that trial counsel objected on the basis of hearsay, we disagree with Appellant's characterization as to why the trial court allowed Detective Rush's testimony.

¶ 25 The standard of review employed when faced with a challenge to the trial court's decision as to whether or not to admit evidence is well settled. Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion. *Commonwealth v. Hunzer,* 868 A.2d 498 (Pa.Super.2005). Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. *Id.*

¶ 26 Hearsay is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa R.E. 801(c). However, in the case at bar, the trial court never found that the statement that Mrs.

Bishop gave to Detective Rush was hearsay and subject to a course of conduct exception as claim by Appellant in his brief. *See* N.T. 11/16/2001, at 65. Rather the trial court concluded that the statement was not being offered for the truth of the matter asserted, and thus not hearsay at all. *Id.*

¶ 27 Detective Rush was asked why he contacted the FBI, and he responded that it was because Mrs. Bishop made the aforementioned statement. Accordingly, we agree with the trial court that the statement was not being offered to prove that Appellant matched a description of a person on *America's Most Wanted,* that he had a bag with duct tape, a knife, a mask, and condom, or that he abused Mrs. Bishop and destroyed the contents of the bag when confronted—it was offered to explain why Detective Rush contacted the FBI. Accordingly, Appellant's argument that Mrs. Bishop's statement to Detective Rush did not fit within an exception to the hearsay rule, is inapposite.

■ ¶ 28 In his final issue, Appellant claims that the lower court erred when it permitted the Commonwealth to introduce testimony about nine non-obscene adult-themed magazines seized from Appellant's truck. As noted above, our standard of review with respect to the trial court's evidentiary findings is for an abuse of discretion. *See Hunzer, supra.*

¶ 29 At trial, over objection by Appellant's counsel, the Commonwealth introduced testimony regarding nine copies of the magazine *"Barely Legal"* that were found in Appellant's truck. Appellant argues that the testimony regarding these magazines was irrelevant and far more prejudicial than probative. Upon review, we agree that the magazines were irrelevant as to whether or not Appellant committed the crimes charged. There was no evidence adduced that illustrated a nexus

between the magazines and the crimes. Rather, when asked about the magazines Detective Rush specifically stated that there was not a link between viewing pornography and committing violent crimes. The exchange is reproduced below:

> [Appellant's Counsel] Q: Okay. Now, these pornographic magazines that you found in his truck, you're not saying for one second that in your experience investigating sex crimes that there's a link, a provable link between having some porn magazines and committing a violent sex act, are you?
>
> [Detective Rush] A: No, I'm not.

N.T. Trial, 11/16/2001, at 255. Accordingly, we find that it was an abuse of discretion to admit evidence concerning the magazines.

■ ¶ 30 However, even though the magazines were improperly admitted into evidence, we find that any error that occurred was harmless. Harmless error is established where either: 1) the error did not prejudice the defendant; 2) the erroneously admitted evidence was merely cumulative of other untainted evidence; or 3) where the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *Commonwealth v. Owens,* 929 A.2d 1187, 1192 (Pa.Super.2007). As noted above, the evidence against Appellant in this case was overwhelming. We conclude that any error in admitting evidence of the magazines was insignificant in comparison to the properly admitted evidence, and the error could not have contributed to the verdict.

¶ 31 For the reasons set forth above, we find Appellant is entitled to no relief. Ac-

cordingly, we affirm the judgment of sentence.

¶ 32 Judgment of sentence affirmed.